Filed 9/26/13  In re S.B. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.B., a Person Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>S.P.,<br><br>        Defendant and Appellant. | A136587, A137947<br><br>(Mendocino County<br>Super. Ct. No. SCUK-JVSQ-12-16526) |

S.P. (father) is the biological father of S.B., a 14-year-old girl with whom father has had no contact.  In these consolidated appeals, he appeals from orders entered by the juvenile court after the dispositional and six-month-review hearings.  He contends the court erred in sustaining a jurisdictional allegation under Welfare and Institutions Code section 300, subdivision (d),[1] failing to ask him whether S.B. has Native American heritage, and denying him presumed-father status under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).  We set aside the jurisdictional finding made under section 300, subdivision (d), but otherwise affirm the orders.

---

[1] Unless otherwise specified, all statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL
BACKGROUND

S.B. was born in 1999. Her mother claimed she became pregnant with S.B. after father raped her when she was 17. Father and mother never married, and father was unaware that S.B. was his biological daughter until 2001 when he took a paternity test and was adjudged to be her father in a child-support proceeding.

Father was incarcerated during mother's pregnancy and for "most of [S.B.]'s childhood." He has never had contact with S.B., although he tried to locate her when he was in prison after learning she was his daughter. He is currently serving a 21-year sentence after being convicted in 2004 of several sexual offenses against minor girls.

Mother is bipolar and schizophrenic, and she has substance-abuse problems. For most of her life, S.B. has lived with, and has been cared for by, her maternal grandmother. In April 2012, the Mendocino County Department of Social Services (Department)[2] filed a petition to have S.B.'s four-year-old half-brother declared a dependent of the court after mother reported that she was in a relationship involving domestic violence, had hit her son, and could no longer care for him.

Shortly after that dependency proceeding was initiated, grandmother was arrested for possessing heroin. Mother signed a "safety plan" agreeing that S.B. would live with mother's sister until S.B. could safely return to grandmother's home. But the Department soon learned that S.B. was living with grandmother instead of mother's sister, that mother and her boyfriend were also living with grandmother, and that mother had relapsed into substance abuse. Mother tested positive for amphetamine, methamphetamine, and marijuana. The Department then filed a separate petition to have S.B. declared a dependent of the court.

---

[2] The Department states that its official name is now the Mendocino County Health and Human Services Agency, Children & Family System of Care. We refer to it by the same name as the parties do.

2

The original petition involving S.B. alleged jurisdiction under section 300, subdivisions (b) and (j). The allegation under subdivision (b) asserted that mother was unable to care for S.B. because of mental-health and substance-abuse problems. The allegation under subdivision (j) asserted that S.B. was at substantial risk of abuse or neglect because mother had physically abused S.B.'s half-brother, had exposed him to domestic violence, and had mental-health and substance-abuse problems.

The Department located father in prison and notified him of the jurisdictional hearing, and the court appointed counsel for him. Father filed a form, Statement Regarding Parentage, in which he requested presumed-father status. He also filed a separate motion for presumed-father status under *Kelsey S.* The *Kelsey S.* motion stated that father "[was] not asking for reunification services, merely to be acknowledged as [S.B.]'s presumed father . . . [and] desire[d] to have a relationship with [S.B.] on whatever terms are best for her."

In its disposition report, the Department reported that father is a registered sex offender who has been convicted of numerous sexual offenses against minors as young as 14. In 1993, father was convicted in Florida for sexual offenses against children. In 1999, in Mendocino County, he received five years probation after pleading no contest to three felony counts of unlawful sexual intercourse with a minor and one felony count of unlawful sexual intercourse with a minor more than three years younger than defendant. In 2004, in Humboldt County, he was convicted of 12 felony counts for sexual crimes against minors, including two counts of rape, for which he received his current sentence.[3]

At the combined jurisdiction/disposition hearing, the Department and S.B. moved to amend the petition to add another jurisdictional allegation under section 300, subdivision (d) by asserting that S.B. was at risk of sexual abuse because of father's record of sexual crimes against minors. S.B.'s counsel argued that father's victims were

[3] The statutes under which father was convicted were Penal Code section 261, subdivision (a)(2) [rape]; section 261.5, subdivisions (c) and (d) [unlawful sexual intercourse with a minor]; section 288, subdivision (c)(1) [lewd or lascivious acts involving children 14 to 15 years old]; section 288.2, subdivision (a) [sending harmful matter to a minor]; and section 288a, subdivision (b)(1) [oral copulation with a minor].

3

in the same age range as S.B., and thus S.B. "[fell] right exactly in line with . . . the many, many victims of this father." The court sustained the subdivision (d) allegation against father, as well as the subdivision (b) and (j) allegations against mother.

In its dispositional order, the court denied father reunification services after finding that father had biological-father status but was incarcerated and not entitled to presumed-father status. The court concluded that reunification services could be bypassed in any event because father had been convicted of a violent felony, as defined by Penal Code section 667.5, subdivision (c). (§ 361.5, subd. (b)(12).) The court also found that "it would be detrimental to [S.B.] to have visitation with her father to include face to face, telephone, electronic communication or letter communication," although it accepted the parties' stipulation that father's counsel could send letters from father to S.B. through S.B.'s therapist, who could then decide whether to deliver the letters to S.B.

The dispositional order also found that the Indian Child Welfare Act (ICWA) did not apply. Mother had been asked several times if S.B. had Native American heritage and had consistently responded that she did not believe so. The record fails to demonstrate, however, that father was ever asked about S.B.'s Native American heritage.

Father timely appealed from the dispositional order (A136587), contending that the juvenile court erred in sustaining the jurisdictional allegation under section 300, subdivision (d) and in failing to ask him whether S.B. has Native American heritage. In this appeal, father does not challenge the court's denial of his *Kelsey S.* motion.

A six-month-review hearing occurred on January 15, 2013. At the hearing, father, through his counsel, again moved for presumed-father status under *Kelsey S.* The motion was based on a letter father had submitted before the hearing in which father explained his lack of contact with S.B. and his desire to be an involved parent to the extent he could. With the letter, father attached weekly letters he had written to S.B. in the hope that they could eventually be shared with her.

The court noted that father "ha[d] a right to try to upgrade his status," but it denied the motion, declined to reconsider the prior *Kelsey S.* ruling, and reiterated that father was

4

to have no contact with S.B. Father timely appealed (A137947), contending in this second appeal that the court erred in denying him presumed-father status.[4]

On our own motion, we consolidated the appeal from the dispositional order with the appeal from the order following the six-month-review hearing.

## II.
### DISCUSSION

A.    *Insufficient Evidence Was Presented to Support the Jurisdictional Finding Under Section 300, Subdivision (d).*

In his appeal from the dispositional order, father argues there was insufficient evidence to sustain the jurisdictional allegation under section 300, subdivision (d). We agree.

Under subdivision (d), a child may be adjudged a dependent if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in [s]ection 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household . . . ." (§ 300, subd. (d).) The juvenile court sustained this allegation because, "while [father's] charges are remote and [he] has been incarcerated throughout [S.B.]'s life, the evidence is such that it does support an additional ground for why [she] might be . . . a child who is at risk of abuse or neglect, specifically sexual abuse at the hands of her father based on his criminal history."

We review the court's jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) In doing so, " 'we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*Ibid.*) Although " ' "substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere

---

[4] Although father's notice of appeal also identifies a January 23 order limiting his right to make educational decisions for S.B., father fails to raise any substantive arguments about the order in his briefs.

5

speculation or conjecture cannot support a finding [citations]." ' " (*In re David M.* (2005) 134 Cal.App.4th 822, 828, italics omitted.)

The Department first asserts that father's argument that there was insufficient evidence to sustain the jurisdictional finding under section 300, subdivision (d) fails because father does not challenge the court's other two jurisdictional findings. We are not persuaded. We recognize as a general proposition that when multiple bases for jurisdiction exist, " 'a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction . . . is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; see also *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492, 1495 [declining to review jurisdictional findings as to father where father did not challenge findings as to mother because no "effective relief" was available].) But an exception to this general rule arises when a jurisdictional finding could be prejudicial to the parent in future proceedings. (*In re D.C.* (2011) 195 Cal.App.4th 1010, 1015.) The juvenile court's finding in this case that S.B. was at risk of being sexually abused by father fell within this exception because it might prejudice father in the future.

We therefore turn to the merits of father's argument. The Department argues that section 355.1, subdivision (d) raises a presumption of risk that father failed to rebut. Under this subdivision, if "the court finds that either a parent, a guardian, or any other person who resides with, or has the care or custody of, a minor currently the subject of the petition filed under [s]ection 300 . . . has been previously convicted" of an act that constitutes "sexual abuse as defined in [s]ection 11165.1 of the Penal Code . . . that finding shall be prima facie evidence . . . that the subject minor is a person described by subdivision . . . (d) of [s]ection 300 and is at substantial risk of abuse or neglect. The prima facie evidence constitutes a presumption affecting the burden of producing evidence." (§ 355.1, subd. (d).)

6

The application of this presumption to this case is uncertain because father has never lived with, cared for, or had custody of S.B. Furthermore, the Department never argued below that the presumption arose, and the juvenile court never addressed the issue. (See *In re A.S.* (2011) 202 Cal.App.4th 237, 243 [finding no entitlement to rely on section 355.1, subdivision (a) presumption involving physical injury to child where there was not sufficient notice of intent to shift burden of production to parents]; but see *In re Ricky T.* (2013) 214 Cal.App.4th 515, 522 ["notice is less critical" for subdivision (d) presumption than subdivision (a) presumption].)

But we need not decide whether the presumption arose—or whether the Department preserved its ability to argue the point—because the record demonstrates that the presumption was adequately rebutted even assuming it arose. It was rebutted because the record shows that father is not due to be released from prison before S.B. becomes an adult. The juvenile court's finding that S.B. was at a substantial risk of being sexually abused by father cannot be reconciled with father's extended incarceration.[5] "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the* [*jurisdictional*] *hearing* subject the minor to the defined risk of harm." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, italics in original; accord *In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

The Department argues that "to assume there is *no* way that [father] would re-enter [S.B.'s] life prior to her reaching age [18] is pure speculation." (Italics in original.) But it is unnecessary for us to assume such a certainty to conclude that S.B. does not face a *substantial* risk of being sexually abused by father. Father's sentence has been affirmed on appeal, and, on the record before us, we have no reason to believe that father has any realistic chance of being released before S.B. becomes an adult. We cannot conclude that some theoretical possibility he could be released before then exposes her to a substantial risk of sexual abuse.

---

[5] Section 300, subdivision (d) does not require "a finding of current risk" if the minor has been sexually abused in the past (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 803), but there is no contention here that S.B. was ever sexually abused.

We recognize that *Carlos T.* affirmed a jurisdictional finding that there was a substantial risk of sex abuse under section 300, subsection (d) to two siblings even though the abusing father was incarcerated. (*Carlos T.*, *supra*, 174 Cal.App.4th at pp. 800, 807.) But the facts in *Carlos T.* are unlike the ones here. In that case, the father had been convicted of sexually abusing one of his children but had not been sentenced or exhausted his appeals at the time of the jurisdictional hearing. (*Id.* at pp. 798-801.) Furthermore, the father denied responsibility for having previously abused both children, the mother denied responsibility for allowing the abuse to occur, and "there [was] every reason to believe that [the] father would resume his sexual abuse of [the minors] without the state intervening to prevent him from obtaining access to them." (*Id.* at p. 806.) Based on these circumstances, the court appropriately concluded that there was a substantial risk that father could be released and endanger the children. (*Ibid*.) By contrast, father here has no history of abusing S.B., is imprisoned based on convictions that have been affirmed on appeal, and has many years remaining on his sentence before he will be released.

In short, we conclude that insufficient evidence was presented at the jurisdiction/disposition hearing to demonstrate that S.B. was at substantial risk of being sexually abused by father since he is in prison and the record provides no indication that he will be released before S.B. becomes an adult. Accordingly, we set aside the juvenile court's jurisdictional finding made under section 300, subdivision (d).

B.      *Any Error in Failing to Ask Father About S.B.'s Native American Heritage Was Harmless.*

Father also argues that the dispositional order must be reversed under ICWA because the juvenile court did not fulfill its duty of inquiry into whether S.B. might have Native American ancestry. We conclude that any oversight by the juvenile court in this request was harmless because father does not claim any actual Native American ancestry.

We begin by discussing our standard of review. A challenge to the adequacy of the juvenile court's inquiry into a child's Indian heritage is reviewed for substantial evidence. (See *In re S.B.* (2005) 130 Cal.App.4th 1148, 1160.) If there is insufficient

8

evidence demonstrating compliance, "any failure to comply with a higher state standard, above and beyond what the ICWA itself requires," such as the duty of inquiry, "must be held harmless unless the appellant can show a reasonable probability that he . . . would have enjoyed a more favorable result in the absence of the error." (*Id.* at p. 1162.)

In applying this standard to this case, we observe at the outset that there is nothing in the record to indicate that S.B. might be an Indian child. An attachment to the petition noted that the Department asked mother about S.B.'s Native American ancestry and was told that there was none. At the detention hearing, mother again denied that she had any Native American heritage. The court then asked her several times whether father had any Native American heritage, and she answered, "Probably not real likely. I'm not sure. I don't think so"; "I slightly doubt it"; and "Probably not." Mother completed and filed an ICWA-020 form, Parental Notification of Indian Status, in which she checked the box indicating that she was not aware of having any Indian ancestry. The detention summary, jurisdiction report, and disposition report all state that mother indicated that S.B. did not have any Indian heritage.

Although mother was frequently asked about S.B.'s potential Native American heritage, father was not. Father argues that this was error, and he has a point. A state statute and a rule of court impose upon juvenile courts duties to inquire whether a child in a dependency proceeding may be an Indian child and to order the child's parents to complete and file ICWA-020 forms.[6] Section 224.3, subdivision (a) provides that "[t]he court . . . ha[s] an affirmative and continuing duty to inquire whether a child for whom a petition under [s]ection 300 . . . has been . . . filed is or may be an Indian child in all dependency proceedings." (See also Cal. Rules of Court, rule 5.481(a).)[7] And rule 5.481 provides that "the court must order [a] parent . . . to complete [an ICWA-020 form]" at that parent's "first appearance . . . . [¶] (3) If the parent . . . does not appear at the first

_____

[6] The duty does not directly arise under ICWA because "ICWA itself does not require an inquiry" into the child's status where there is no indication that a dependent child is Indian. (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1386, italics omitted.)

[7] All further rule references are to the California Rules of Court.

hearing, or is unavailable at the initiation of a proceeding, the court must order [the agency] to use reasonable diligence to find and inform the parent . . . that the court has ordered the parent . . . to complete [that form]."  (Rule 5.481(a)(2), (3).)

We cannot conclude on the record before us that the juvenile court discharged its duties under section 224.3 and rule 5.481 because there is no indication that father was either asked about S.B.'s potential status as an Indian child or directed to submit an ICWA-020 form.  (See *In re J.N.* (2006) 138 Cal.App.4th 450, 460-461 [duty of inquiry breached where one parent was asked about child's Native American heritage but other was not].)  Although the court asked *mother* whether father has Native American heritage, her long-estranged relationship with father and uncertain response were insufficient to establish conclusively that S.B. is not an Indian child.  (Cf. *In re N.E.* (2008) 160 Cal.App.4th 766, 769 [unclear whether duty of inquiry breached where mother, who had lived with father for three years, told social worker that father did not have American Indian heritage].)  And the court neither ordered father to complete an ICWA-020 form nor ordered the Department to inform him he needed to do so, as rule 5.481 requires.[8]

Nevertheless, we determine that these errors were harmless.  When the duty of inquiry is unfulfilled, " 'a limited reversal of [the] order . . . and remand for proper inquiry and any required notice' " is necessary unless " 'the court's noncompliance with the inquiry requirement constitutes harmless error.' "  (*In re Noreen G.*, *supra*, 181 Cal.App.4th at pp. 1387-1388.)  Father does not contend on appeal that he has Native

---

[8] The Department points out that father was served with, but never objected to, the jurisdiction and disposition reports, which indicated that ICWA was inapplicable.  To the extent the Department is suggesting that father forfeited his arguments, we disagree.  We follow the majority of courts that have held that a parent's failure to object to an ICWA-notification issue in the lower court proceedings does not forfeit the issue on appeal because tribal interests, not just parental interests, are implicated.  (See, e.g., *In re Z.N.* (2009) 181 Cal.App.4th 282, 296-297; *In re J.T.* (2007) 154 Cal.App.4th 986, 991.)  In doing so, we recognize that some courts have found exceptions to this nonforfeiture rule in circumstances not present here.  (See, e.g., *In re S.B.*, *supra*, 130 Cal.App.4th at pp. 1159-1160 [where tribe participated in lower court proceedings, mother's failure to object forfeited duty-of-inquiry issue].)

10

American ancestry and admits that "there is nothing in the record to suggest that" he does. Under these circumstances, any error in failing to comply with section 224.3 and rule 5.481 was harmless. "Where the record below fails to demonstrate and the parents have made no offer of proof or other affirmative assertion of Indian heritage on appeal, a miscarriage of justice has not been established and reversal is not required." (*Noreen G.* at p. 1388, citing *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430-1431.)

Father attempts to distinguish *In re Rebecca R.* by arguing that the appellate court in that case remanded the case for additional reasons besides there being no "miscarriage of justice." (*In re Rebecca R.*, *supra*, 143 Cal.App. at pp. 1429-1431.) As *Rebecca R.* makes clear, however, a "miscarriage of justice" is "the fundamental requisite before an appellate court will reverse a trial court's judgment." (*Id.* at p. 1430, citing Cal. Const., art. VI, § 13.) Father's repeated citations to *Rebecca R.* show that father knew of, but could not satisfy, the slight "burden on an appealing parent to make an affirmative representation of Indian heritage." (*Rebecca R.* at p. 1431; see *In re N.E.*, *supra*, 160 Cal.App.4th at p. 771.) We conclude that any errors in failing to ask father about S.B.'s Native American heritage were harmless.

*C.    The Juvenile Court Properly Denied Father Presumed-Father Status.*

In his appeal from the order following the six-month-review hearing, father argues that the juvenile court wrongly denied him status as a *Kelsey S.* father. We disagree.

" 'California dependency law distinguishes between a presumed father, a biological father and a biological father who came forward early in the dependency case and displayed a full commitment to the child (*Kelsey S.* father).' " (*In re T.G.* (2013) 215 Cal.App.4th 1, 5.) " 'A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled.' " (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.) Presumed fathers are entitled to " 'appointed counsel, custody (absent a finding of detriment), and a reunification plan.' " (*Ibid.*)

Family Code section 7611 "sets out several rebuttable presumptions under which a man may qualify for [presumed-father] status, generally by marrying or attempting to

marry the child's mother or by publicly acknowledging paternity and receiving the child into his home." (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018.) Alternatively, a father may qualify for presumed-father status under *Kelsey S.* (*In re J.L.* at p. 1023.) "To qualify as a *Kelsey S.* father, a biological father must show he promptly stepped forward to assume full parental responsibilities for the child's well-being, including a financial, emotional or other commitment; the child's mother thwarted his efforts to assume his parental responsibilities; and he demonstrated a willingness to assume full custody of the child." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 932.)

A biological father has the burden in the juvenile court to establish the facts supporting *Kelsey S.* status. (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679.) The standard by which we should review the juvenile court's *Kelsey S.* determination is somewhat unsettled. While appellate courts generally have reviewed *Kelsey S.* determinations for substantial evidence (e.g., *O.M.* at pp. 679-680; *In re J.L.*, *supra*, 159 Cal.App.4th at p. 1023), this standard of review is typically applied where the party who did *not* have the burden of proof below challenges a ruling in favor of the party who did. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) Where, as here, the court below "expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals," at least one court has concluded that "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Ibid.*) In this case, we need not resolve which standard of review applies because we conclude that the juvenile court order should not be disturbed under either of them.

The Department first argues that father forfeited his argument that he was improperly denied *Kelsey S.* status because he failed to raise the issue in his appeal from the dispositional order. We disagree. Father asked the juvenile court to reconsider its *Kelsey S.* ruling, and he was entitled to do so. (§ 388, subd. (a)(1) ["Any parent . . . may,

12

upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made"]; see also *In re Zacharia D.* (1993) 6 Cal.4th 435, 454-455 [request for modification of ruling that father had not attained presumed-father status].) Although father did not ask for a reconsideration by filing a section 388 petition, his letter to the court filed before the six-month-review hearing made it clear that he remained dissatisfied with the earlier denial of presumed-father status. In the letter, father discussed the court's original *Kelsey S.*-related findings about his failure to seek a relationship with S.B., offered more explanation of the circumstances, and attached letters he had written to S.B. since the jurisdiction/disposition hearing. Given that these materials were submitted before the six-month-review hearing, and given that the juvenile court "has the statutory power to order that reunification services, including visitation, be . . . modified," we conclude that father provided sufficient notice to have enabled the court to modify its earlier finding even though a section 388 petition was not filed. (*In re Natasha A.* (1996) 42 Cal.App.4th 28, 34-35; see § 386 [prohibiting modification of previous orders without notice to the social worker and child's counsel].)

Even though we agree with father that he adequately preserved the issue, we disagree with him on its merits and conclude that the juvenile court properly denied him *Kelsey S.* status. The inescapable fact is that father will be incarcerated until well after S.B. becomes an adult and is in no position to assume anything but the most limited parental responsibilities. He offers no reason, nor do we perceive one, why he should be excused from meeting the requirement under *Kelsey S.* that the father "demonstrate 'a willingness himself to assume full custody of the child.' " (*Kelsey S., supra*, 1 Cal.4th at p. 849; see *O.M., supra*, 169 Cal.App.4th at pp. 681-682 [incarcerated father who sought only legal custody not entitled to *Kelsey S.* status].)

Furthermore, father has never shown that he " ' "promptly attempt[ed] to assume his parental responsibilities as fully as the mother [would] allow and the circumstances permit[ted]." ' " (*Adoption of O.M., supra*, 169 Cal.App.4th at p. 679.) According to father, he learned that S.B. was his daughter in 2001 after taking a paternity test and was

13

not incarcerated again until at least a year later. In making its original *Kelsey S.* determination, the juvenile court found that father had made no effort to initiate contact with S.B. during that year. While father has since submitted a letter offering various explanations for his failure to contact S.B., such as that mother and S.B. had moved out of state and then back again without his knowledge, these excuses did not require the juvenile court to change its original ruling. Father's "own criminal activity," far more than "any unilateral action" by mother, is the primary reason he failed and is unable to assume his parental responsibilities. (*O.M.* at p. 680.)

Finally, we point out that father suffered no harm by being denied *Kelsey S.* status because the status would not have affected the concerns he raised,[9] which include his desire to receive reunification services, have his relatives considered for S.B.'s placement, and avoid termination of parental rights. First, father was not entitled to reunification services regardless of his status as a biological or presumed father. A presumed father is not entitled to reunification services when, as in this case, "the court finds, by clear and convincing evidence," that the father "has been convicted of a violent felony, as defined in subdivision (c) of [s]ection 667.5 of the Penal Code." (§ 361.5, subd. (b)(12).) Father does not challenge this finding.

Second, father never identified any relative who might be suitable for placement. If he had, his status as a biological father would not have precluded such a placement. (See Cal. Judges Benchguide, Juvenile Dependency Disposition Hearing (CJER rev. 2011) § 102.55, p. 102-45 ["If there is no presumed father . . . the court may place the child with a relative of the man who is declared to be the biological father under a judgment of paternity"]; see also Seiser & Kumli, Cal. Juvenile Courts Practice & Procedure (2013 ed.) Relative Placement, § 2.127[3], p. 2-386 ["Relatives of alleged

---

[9] We reject father's contention that the denial of *Kelsey S.* status is a structural error that requires automatic reversal. (See *In re James F.* (2008) 42 Cal.4th 901, 915-917 [cautioning against use of structural error doctrine in dependency cases and noting that "most structural defects 'defy analysis by "harmless-error" standards' "].)

14

fathers are not considered relatives of the child for purposes of placement until the man has actually been determined to be a biological or presumed father of the child"].)

Third, father claims that he was harmed because parental rights cannot be terminated for a *Kelsey S.* father without a finding " 'of detriment or unfitness.' " (*In re Jason J.*, *supra*, 175 Cal.App.4th at pp. 933-934.) But such a finding has essentially already been made because the juvenile court found by clear and convincing evidence that reunification services for, and visitation with, father would be detrimental to S.B. (See *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253 [no requirement to find parental unfitness at section 366.26 hearing to terminate parental rights because "there have been multiple specific findings of parental unfitness" at earlier stages of case].)

We conclude that the juvenile court properly denied father *Kelsey S.* status and father has shown no prejudice from the ruling.

III.
DISPOSITION

The dispositional order is modified to strike the finding under section 300, subdivision (d) that S.B. is at substantial risk of being sexually abused. As so modified, that order is affirmed. The six-month-review-hearing order is affirmed.


_____
Humes, J.


We concur:


_____
Ruvolo, P. J.


_____
Rivera, J.